# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## W. B. STUART AND LONA P. STUART V. A. F. JOHNSON.

### November 17, 1927.

1. SALES—*Trees and Timber—Sale of Timber on Certain Tract—Burden of Proof.*—In an action by the seller of merchantable timber standing on a tract of land against the buyer, the burden of proof is upon the plaintiff as to the quantity of timber removed by the buyer.

2. SALES—*Trees and Timber—Sale of Merchantable Timber on Tract of Land—Action for Timber Removed—Evidence of Amount of Timber Cut.*—The instant case was a controversy growing out of the sale of merchantable timber on certain tracts of land by plaintiffs to defendant. The ascertainment of the gross quantity of timber cut under the contract was the major question to be determined. The jury found the quantity to be 1,000,000 feet, but the court reduced this to 611,756 feet. Plaintiffs assigned this reduction of the verdict as error. Plaintiffs undertook to support their claim that 1,000,000 feet or more of lumber had been cut by evidence of the price at which the property had been offered for sale, and by estimates of the standing timber on the land made before and at the time of the contract, and by evidence that the defendant had nearly finished cutting, and upon these estimates and prices based their argument in support of their claim that over 1,000,000 feet had been cut. On the other hand, evidence of a sawyer of defendant, a witness for plaintiffs, was to the effect that only 611,000 and some feet were cut. Plaintiffs introduced six witnesses who had been employed by defendant to haul the lumber and from their testimony it would appear that 640,000 and some feet had been cut.

   *Held:* That the evidence of the sawyer was the best evidence in the case and the court did not err in reducing the verdict.

3. TREES AND TIMBER—*Amount of Timber Cut—Evidence.*—Estimates and predictions as to the amount of timber on a tract of land made to induce sales are not the best evidence to prove the quantity thereafter actually severed and manufactured. A large quantity of timber cannot be cut, sawed and removed secretly, because it requires the services of too many people. Such previous predictions become of little value in ascertaining the quantity of lumber manufactured and removed, because it is perfectly apparent that it should not be

difficult to show that quantity by those who felled the trees; those who manufactured and transported the lumber; by the records of the transportation company over whose lines it was shipped; by the purchasers of the lumber to whom it was shipped; and in other obvious ways. There are quite a number of reasonably certain sources of information on questions of this character.

4.  APPEAL AND ERROR—*New Trial—Conflicting Evidence.*—A trial judge should not set aside a verdict when there is a conflict of evidence merely because he differs with the jury, but this rule cannot be applied where there is no substantial conflict in the evidence.

5.  APPEAL AND ERROR—*Record—Plaintiffs in Error must Rely upon Record—Case at Bar.*—Where the question at issue was the amount of lumber cut and shipped from plaintiffs' land under a timber contract with defendant, six draymen were introduced as witnesses by plaintiffs. Each testified to the number of feet hauled by him from the land. It was suggested in argument that perhaps there were other draymen, and that those testifying were unwilling witnesses. If true, these facts should have been shown. There was no suggestion in the record that there were any other draymen except the six who testified, and nothing to discredit their testimony, and plaintiffs, who were also plaintiffs in error, in error could only rely upon the record.

6.  ATTACHMENT—*Abatement of Attachment—Grounds of Attachment—Removal of Timber to Hinder and Defraud Seller—Case at Bar.*—The instant case was an attachment by plaintiffs against defendant. The trial court, without any motion from the defendant, abated the attachment upon the ground that it was issued without probable cause. The contract between plaintiffs and defendant required defendant to pay for lumber cut on plaintiffs' land and removed therefrom at a price agreed at certain stated times. This requirement of the contract the defendant persistently violated. Defendant wrote plaintiffs that he could not pay a note given for lumber removed, and his letters show that he was in desperate financial straits. With the exception of the lumber for which he had not paid plaintiffs, defendant apparently had little of substantial value. Defendant failed to render any accurate account of the lumber which had been sold and removed by him. Defendant's other creditor's could have subjected the lumber to their claims. There was other evidence of defendant's financial irresponsibility.

    *Held:* That the court erred in abating the attachment, and that plaintiffs were fully justified in suing it out and had sufficient cause therefor.

Error to a judgment of the Circuit Court of Highland county in a proceeding by attachment. Judgment for defendant. Plaintiffs assign error.

*Amended; partly affirmed; partly reversed; remanded.*

The opinion states the case.

*J. Seybert Hansel, J. M. Colaw,* and *Curry & Carter,* for the plaintiffs in error.

*Timberlake & Nelson* and *Edwin B. Jones,* for the defendant in error.

PRENTIS, P., delivered the opinion of the court.

This controversy grows out of a contract, dated September 23, 1924, whereby the plaintiffs, the Stuarts, sold the defendant, Johnson, all the merchantable timber on a 195 acre tract of land in Highland county, to be removed on or before May 11, 1926, and all on a 144 acre tract in the same county, "that will go down into Wide Draft, making the top of Hulett Ridge the boundary of said tract," to be removed within three years. The vendee, Johnson, was to pay $5.00 per thousand board feet according to measurements to be made before the lumber was removed from the land. Payments were to be made on the first and fifteenth of each month for all timber theretofore hauled off of the land.

Plaintiffs sued out an attachment against the property of the defendant, and have recovered a judgment for $2,339.22, with interest from June 1, 1926, and costs; but the court abated the attachment, as issued without probable cause.

Without objection from either party, seven interrogatories were submitted to the jury. These with their answers are:

"1. What was the gross amount of lumber sawed

by the defendant after the execution of the contract of date September 23, 1924? Answer. 1,000,000 feet.

"2. What amount is now stacked on the Kincaid and Armstrong land? Answer. 374,822 feet.

"3. What amount has been shipped away? Answer. 625,178 feet.

"4. Was this lumber shipped away by Mr. Johnson with any intention to hinder, delay, or to defraud Mr. Stuart out of anything due to him under the contract of September 23, 1924? Answer. Yes.

"5. When did Mr. Stuart first know where this lumber was being stacked? Answer. Sometime in January, 1926.

"6. When, if at any time, did Mr. Stuart object to its being stacked where it is or claim that it made the purchase money thereof immediately due? Answer. At once.

"7. What if anything is due on account of the Johnson counterclaim? Answer. Nothing."

Whereupon the defendant moved the court to set aside the verdict. After careful consideration, the court sustained that motion and set aside the verdict of the jury, on the ground that it is contrary to the law and the evidence and without evidence to support it; and proceeded to enter up such judgment as seemed right and proper.

The plaintiffs were claiming that defendant had failed to account for about 1,300,000 feet of lumber, at $5.00 per thousand feet, amounting to the sum of $6,500, while the defendant claimed that this amount was greatly exaggerated.

As shown by the record and the opinion of the learned judge of the trial court, the ascertainment of the gross quantity of timber cut under the contract is the major question to be determined. The jury

found the quantity to be 1,000,000 feet, but the court reduced this to 611,756 feet, and the judgment is based on that quantity at $5.00 a thousand feet, subject to certain credits.    The plaintiffs are here assigning several errors.

The assignment to which we first give attention is, that the court erred in not basing the judgment on the finding of the jury that 1,000,000 feet of lumber had been cut and removed under the contract.

[1] The initial burden, of course, rested upon the plaintiffs, and the court should have accepted the verdict of the jury, unless it was contrary to the evidence, or without supporting evidence.

[2, 3] They undertook to support their claim by certain evidence of the price at which the property had been offered for sale; that before and at the time of the contract the quantity of the standing timber had been estimated upon these lands (in conjunction, however, with the growing timber on other lands belonging to the same plaintiffs), and that the defendant had nearly finished cutting it over; and upon these estimates and prices they based an argument to support their claim that over a million feet had been so cut and removed under the contract.    We pause here to say that such estimates are predictions, made to induce sales, and however persuasive they may be in certain cases, are not the best evidence to prove the quantity thereafter actually severed and manufactured. A large quantity of timber cannot be cut, sawed and removed secretly, because it requires the services of too many people.    Such previous predictions become of little value in ascertaining the quantity of lumber manufactured and removed, because it is perfectly apparent that it should not be difficult to show that quantity by those who felled the trees; those who

6

manufactured and transported the lumber; by the records of the transportation company over whose lines it was shipped; by the purchasers of the lumber to whom it was shipped; and in other obvious ways. There are quite a number of reasonably certain sources of information on questions of this character.

Realizing this, doubtless, the plaintiffs also introduced a witness, Sweringen, who was one of the sawyers at the defendant's mill. It is said in argument that this sawyer was an adverse and reluctant witness, but there is nothing in his testimony to indicate either that he was adverse or reluctant, unless the mere fact that he did not support the plaintiffs' claim can be said to justify that charge. He testified clearly that he sawed about 281,000 feet; that his brother sawed 130,758 feet; and that there was a man named Hostetter who sawed several months before he and his brother commenced, and that it looked to him from the stumps that Hostetter had sawed about 200,000 feet. There appears to be no explanation in the record as to why Hostetter was not examined as a witness by either of the litigants. The plaintiffs introduced a witness, Huffman, who was employed by Stuart to check up on the matter in 1924. He saw Hostetter and testified that Hostetter got out his book and that he (the witness, Huffman) took the figures down and made it 110,490 feet at that time—that is, covering the period from June 1 to October 2, 1924 (some of this must have been under a previous contract referred to in the record). Hostetter sawed for several months after that time. They also introduced six witnesses who had been employed by the defendant, Johnson, to haul the lumber from the land. Each one testifies to the number of feet hauled by him. Some of them testify to the precise quantity and some to an estimated

number of feet, as between "twelve and fourteen
thousand feet," in one instance; and in another "nine
loads of 1,300 to 2,000 feet, averaging about 1,800 feet
a load." Taking these figures of the draymen, it
appears in round numbers that there had been about
265,000 feet hauled away. To these figures should be
added the precise quantity of lumber remaining in the
possession of the defendant which had not been sold,
though it had been removed and stacked on the
Armstrong land. This amounts to 374,822 feet. It
is from this evidence, substantially, that the jury
reached their verdict that one million feet had been
severed. The court correctly holds that these esti-
mates of the timber theretofore growing upon the land,
there being nothing to show how or with what care
they were made, how the timber was cruised, if it was
cruised at all, were insufficient to support the verdict;
that the best evidence from which the jury could make
up their verdict on this point was the testimony of the
sawyers, and that from this it appears that the quantity
of timber cut under the contract was 611,758 feet; and
that this having been testified to by witnesses intro-
duced on behalf of the plaintiffs afforded the only
substantial basis for a verdict—that is, to Sweringen's
figures of 281,000 feet there should be added those of
his brother, 130,758 feet, and to that the 200,000 feet
which Sweringen estimated from the stumps that
Hostetter had sawed. This conclusion of the trial
judge is substantially corroborated when the amount
of lumber still on hand is added to the amount of lum-
ber which had been hauled away by the draymen—that
is, 266,000 feet hauled away, 374,822 feet remaining.
These figures aggregate 640,822 feet; but some of that
which had been hauled away had been hauled under a
previous contract for which the defendant has fully

paid the plaintiffs, so that this is not involved in this controversy.

[4, 5] While, of course, it is settled that the trial judge should not set aside a verdict when there is a conflict of evidence merely because he differs with the jury, that rule cannot be applied where there is no substantial conflict. A jury cannot be permitted to speculate about a question of this sort, but must consider and heed the evidence. The best evidence which is submitted by the plaintiffs in this case is that showing the amount of timber sawed by the defendant's sawyers, and the amount of lumber now on hand, added to that which has been disposed of. The quantity fixed by the jury in their verdict is obviously a mere estimate. The answer to the third question, that 625,178 feet had been shipped away, was arrived at by deducting 374,822 feet, the amount left on hand, from the 1,000,000 feet which the jury found had been sawed. There is absolutely no evidence that 625,178 feet had been shipped away. The only evidence of the lumber shipped away is that supplied by the defendant and that introduced by the plaintiffs which we have recited, given by the draymen who hauled it. There is a suggestion in argument that perhaps there were other draymen, and that these were unwilling witnesses. If true, these facts should have been shown, and then all proper inferences to be drawn therefrom might be made. There is no suggestion in the record that there were any other draymen except the six who were introduced and who testified for the plaintiffs, and nothing to discredit their testimony.

It seems to us, then, sufficiently clear that the basis of the judgment of the trial court is as nearly correct and as just to the plaintiffs as it can possibly be made, under this record, upon which alone the plaintiffs can

rely.   We find no error in this conclusion, but there is error in the amount of the credits allowed.   Apparently this grows out of the allowance of $190, which is the principal amount still due the plaintiffs on an unpaid note of the defendant.   The precise amount of these credits is shown by four statements introduced by the plaintiffs, sent by the defendant to them.   The latest of these is that which enclosed a note which has been renewed twice and curtailed by $190.   These credits aggregate $562.45.   After deducting this sum from the gross amount, there remains $2,496.34.   The principal of the judgment will, therefore, be increased to that sum, with interest from June 1, 1926, and as amended will be affirmed.

There is another question, however, to which we must address ourselves.   The court, without any motion from the defendant, abated the attachment upon the ground that it was issued without probable cause.

[6] These were the circumstances under which the attachment was issued:   The contract required the defendant to pay for the lumber, at the price agreed, on the first and fifteenth of each month for all lumber thereafter hauled off the land prior to such recurring dates.   This requirement to the contract the defendant persistently violated.   He never seemed to pay the slightest attention to his obligation to perform his contract in this respect.   The plaintiffs appear to have been indulgent or indifferent.   He gave a note to the plaintiffs December 26, 1925, for $197.17, for lumber removed.   This note was twice renewed, curtailed $7.17, leaving $190, and this is still unpaid.   On May 21, 1926, he wrote the plaintiffs that he could not pay it, and his own letters show that he was in desperate financial straits, had exhausted his credit, and that his only means of paying his debt to the plaintiffs was

by a sale of the lumber. He had a home, estimated to be worth around $6,000, which is subject to a lien for $4,000, and there was a lien of $550 on his sawmill. He apparently had nothing else of substantial value except this lumber for which he owed the plaintiffs. There was one unsatisfied judgment against him for a small amount due to one of the draymen, and other overdue debts. He failed to render any accurate account of the lumber which had been sold, or to pay the plaintiffs therefor, and had made no report thereof from December, 1925, to June 8, 1926, when the attachment was issued. He expected to sell the lumber which he had on hand undisposed of, which had been removed from the plaintiffs' land to a more convenient place of shipment. His other creditors could have subjected it to their claims and acquired liens prior to the claim of the plaintiffs for the purchase money. At the same time, he had been in financial trouble with the Federal government because of what he calls a "mix up" in his accounts as postmaster, and had been forced to make an apparent shortage good. Under these circumstances, the answer of the jury to the fourth interrogatory is not surprising. They found that the lumber removed from the land by the defendant without paying for it and in violation of his contract, was with intent to hinder, delay and defraud the plaintiffs.

We conclude, therefore, that the court erred in abating the attachment. The plaintiffs were fully justified in suing it out, and had sufficient cause therefor. The property attached should have been held subject to the lien of the attachment and disposed of according to law.

We will, therefore, amend and affirm the judgment in favor of the plaintiffs, but reverse so much of the

order as abated the attachment, and remand the case to the trial court for such further orders for the enforcement of the attachment as may be necessary.

*Amended; partly affirmed; partly reversed; remanded.*